The first case for argument this morning is 22-1598, Alexsam v. Simon Property Group. Mr. Richardson. Good morning, and may it please the Court. The District Court for the Eastern District of Texas erred when it failed to perform a derivative claim construction for the phrase, for use in the card system, which is a phrase found within the party's stipulated construction of the claim term on modified point-of-sale device. During the summary judgment proceedings below, the parties took opposing views about the meaning of the derivative phrase. The District Court should have performed an examination of the intrinsic evidence as is required by long-standing Federal Circuit precedent. It did not do so. Well, can you be precise in terms of what this derivative claim construction or the construction deals with for use in the card system? Your Honor, thank you. The phrase, for use in the card system, means using a standard POS device, the standard POS device functionality to perform the claimed functions. And that is directly related to the meaning of the term unmodified. So we know from examining the intrinsic evidence relative to the term unmodified that the term or phrase, for use in the card system, must relate to the unmodified definition that's in the record, the intrinsic record. I'm not sure I frankly really understand the distinction. So what are the two alternatives? Maybe that will help me understand. Well, thank you. The two alternatives are one that's presented by the 608 patent itself, which was a system that was intended to operate over the banking system using a BIN or a bank identification number. The other alternative was to use software, custom software, which is described in the remarks to the Patent Office, to use custom software to perform transactions from that device, the POS device, but off the banking network. So those were the two choices. An unmodified device, which treated the card much like a credit card, that used a BIN. But we're here on summary judgment of non-infringement, and I thought the issue here, although I've got a lot of cases this week, so maybe I'm confusing this with something else, but I thought the issue here was whether or not you would put it on sufficient proof, right? So, Your Honor, there's two questions here, if I may. The first is claim construction, and that is that there was an improper claim construction that was applied below. The second question I think that you may be referring to has to do with the issue of the impact of the IDT decision that the court reached some number of years ago and whether under that standard we had presented sufficient evidence. And I can address both of those issues. And does the answer to that question differ, in your view, based on which claim, whether we adopt your derivative claim construction or not? I think it does substantially for a number of reasons, and that is that the IDT court did not perform any claim construction, let alone a derivative construction. So to understand the application of IDT, one first needs to understand... Okay, I think this is... Can you just go back? So on the claim construction... Yes. You want some smaller set of modifications than the other side wants. They want to say kind of their... I'm going to overstate this. Any modification of the software or hardware for working on the system takes it out of the claim. You want to say, no, it has to be a very particular kind of modification. Yes, Your Honor. How do you define your subset of changes that would remove something from the claimant? Your Honor, thank you for the question. And that's answered... It's just the same question. I think it was asked. It was, and I appreciate both questions. The answer is found in six sentences of APPX 3469 to 3470. And in that... And I'll give you a moment, if you would, to find that. These are the remarks accompanying... Can you tell us the page numbers again? Yes, APPX 3469 to 3470. What volume is that? This is the prosecution history? It is. That's okay. I got it. Do you have it? Which volume is it? I think it's in volume three. There's a lot of yellow on these pages. I was surprised to see the yellow as well, Your Honor. Well, you can't read us stuff that's in yellow unless you both have agreed that this isn't protected. This is not protected information. No, this is... The yellow is from the district court's requirements that you highlight certain things to put in for... Okay. That's a little inconvenient given that the yellow means something much different up here. Much different here. Yes, Your Honor. If I could draw your attention maybe a little bit out of order to 3470, this is where the definition actually takes place. The six sentences I was referring to begins on the page preceding, but the definition is at the top of 3470, which reads, this additional programming is required so that the point-of-sale device can reach network devices outside the banking network. So these were the two, and you can see, again, at the bottom of that paragraph, there's an emphasis, again, that all of the prior art references were directed to solutions outside or independent of the banking network. So those were the two choices, to use an existing standard POS device, which is required by the specification, required to use a BIN and therefore access the banking network, or use custom software, a modification, that would allow you to perform transactions on these multifunction cards outside the banking network. Those were the two choices. And we know that this is true from the preceding... So you've invented a multifunction card that doesn't require extra programming at all these terminals. Is that your view? That is in part the view, because we're not talking about any programming, again. Or hardware. Yeah, but... I'm sorry? I'm struggling with this a little, too, about what it means for use in the card system. So I take it, first of all, you have a multifunction card, and the prior art to use those multifunction cards, or at least one of the things you referenced, required specific programming to adapt the POS terminals to work with it. Is that right? Well, the end of that sentence is to reach a processor outside the banking network. Because the two choices, then, were do the prior art, which was outside the banking network, and use software or hardware. They could use, for example, the Stimson closed system. But you use software or hardware to direct these transactions outside the banking network. Or you use the 608 patented system, which operated on the system, on the banking system, by using a BIN. And that was mandated by Column 4 that required the use of a BIN on the POS devices of the 608 patent. I'm still trying to pin down exactly what you're arguing. Is your argument, then, that the point of this invention is to take a multifunction card and use the BINs so that it can just be plugged into any terminal? Yes. And without any kind of special hardware for the terminal or special software for the terminal? Exactly. It wouldn't require some sort of special scanning device. It wouldn't require some sort of single-function dedicated hardware, which is what the Stimson device was at Column 2 of the patent. You're exactly right. Yes. Okay. I get that. Because you've been relying on this stipulated construction for a long time, right? Yes. Where was the first time you ever specifically raised this notion of what it means to be unmodified is not the terminals are unmodified from July 1997, but there's no specialized programming required to adapt it, hardware or programming, to adapt it to this multifunction card. With respect to this case? No, ever. Because this construction has come up over and over again, and there's been understandings, I think, about how it's to be applied, particularly in our IDT case. Your construction doesn't necessarily seem wrong to me, but I don't know that you've made it specific enough before. Thank you, Your Honor. The answer to your question is the Green Dot, Alexander v. Green Dot case, was the first time that I personally was aware of and made these arguments. That resolved in a settlement, and the issues were not reached further. But we've got data streams. We've got IDT. We've got GAP, I think. Sure. So is Judge Hughes correct that in all of those other cases, the stipulated claim construction was not the derivative claim construction you're arguing? The derivative claim construction was not reached previously. That is true. It's not a question of not reached. It wasn't presented by you or offered up by you. By Alexander? In terms of modifying what you had stipulated to as the correct. Your Honor, I think I can say that you are correct, that I am not aware of the litigation of that phrase for use in the card system previously. I would say, and I think this is important, that during claim construction in this case, we did notify Simon and Blackhawk that that was our view. And I would cite to Mr. Zatkovich's report that was provided for claim construction, particularly paragraph 52, and the pages that precede that. And if you're interested in learning about our disclosures and arguments in this case that impact this claim construction, that's where I would initially point your honors to, that this was something that has been known very early, was our view of the phrase. If this was true, why didn't you make this argument in IDT? I mean, it seems like you were making a very similar argument there, maybe not in these specific words, but at least as I understand it now, maybe it's too simplistic, is you're just saying these cards can be used in any kind of point-of-sale terminal that uses regular banking stuff. And the fact that, and this is the way I was thinking about it earlier, maybe you can tell me if this is right or not, this doesn't matter whether we've gone from card readers that you use to swipe, to card readers that you insert, to card readers that you use a chip for and tap now. Is that your view? That's exactly right. But that doesn't seem to be the claim construction that's at least implicit in the IDT case, because your argument there seemed also to be that it's unmodified because you can just use a Visa card, which we've rejected. Yes, but I'd like to unpack that a little bit, if I may. The IDT court, the problem below, certainly, and with our opposition's argument is that they're conflating the factual recitals of that case with the holding of the case. And I'd like to directly address the point you made about the standard of the card. I understand that point, that we didn't decide that specifically as a claim construction issue, but it seems that there's at least an inference that that was what was going on, and your arguments to avoid summary judgment were that because this was a Visa card, it would work with any point-of-sale terminal, that that was good enough. In IDT? Yeah. That was after trial, and the citations there are to the trial record. And the trial record showed only that the expert... Let me just ask you, if that was your argument there, and it was rejected, then isn't that your argument here today, basically? No. That because they're Visa cards? I know you have experts that say additional stuff, but the gist of it is, because it sounds like it's the gist of your admission, is these are multifunction cards that will work with any standard point-of-sale terminal. Thank you for the question, and this is a critical point. You know you can stop thanking us for our questions. Oh, I'm sorry. But I'm grateful to have this question, because it is something that I've been wanting to speak about. Fundamentally, it is not enough to just have a credit card device. Okay, well, then tell us what else... It's unmodified, which means you need to show that it is not using custom software to direct that card traffic off of the device. Let me just say, you need to show who's got the brim here. We do, absolutely. So you need to show... Yes, we need to show that the card is being processed via the BIN and banking network and not via the custom software that is not allowed by virtue of the construction or the definition provided by the applicant. That's what the difference is. IDT says it was not enough to just show that they could process standard transactions, and we agree. Our burden is to show not just that they were capable of processing these transactions, but that the cards at issue were actually processed using that mechanism, the BIN through the banking network, as opposed to the custom software that allowed you to process, for example, the Stimson card outside the banking network. That was our obligation, and that's what we've done. Okay, we're way beyond the time. While we store some rebuttal time, let's hear from the other side. I'm apologizing. Thank you. Two people are arguing splitting time, and can you tell me what you're going to argue versus what the other side is going to argue? Sure, I'm up for 13 minutes, and basically most of the issues that apply to my client, Blackhawk Network, and then there's a couple of issues that apply to Simon. Did we really need to have two full red briefs in this case? The answer is yes, Your Honor. We had below, we each filed separate summary judgment motions because there are different products at issue. There are some overlapping products, and then there are some different products. But there are not different products on appeal. No, there are different products on appeal as well. Oh. May it please the Court, all the asserted claims of the 608 patent require an unmodified existing standard point-of-sale device. In order to get the 608 patent issued, Alex Sam needed to distinguish the anticipatory prior art reference Stimson. Alex Sam told this examiner that, quote, Stimson teaches the use of customized software requiring modification of existing point-of-sale devices, that for the applicant's invention, custom software is not necessary, and that, quote, existing point-of-sale devices can be utilized without modification, and that the invention is a, quote, great benefit over the systems of the prior art since no additional programming is required in the device of the point-of-sale. So what is your response to the prosecution history that your friend directed us to? It's clear and unmistakable that in order to get around Stimson, the appellant here had to basically say that unmodified was something that was now in the invention.  the examiner would not allow the claims. Without Alex Sam agreeing to add the word unmodified to every single independent claim via an examiner's amendment to overcome Stimson. So it was added to every claim. It wasn't there before, but in order to get around Stimson, which was anticipatory, it was added. And specifically the... We still have to determine unmodified with respect to what, don't we? Is your view that any kind of modification, like what I said earlier, going from a swipe system to an insert system to a chip system, even if everything else and whatever software is needed to do that, even if everything else with regard to their invention stays the same, does that bring it out? I would go with what the court said. This court said in IDT,  no modifications were actually made to the terminal software in order to allow them to activate the cards. If you wanted to paint the terminal a different color, that's okay. I get it, but it sounds like... I mean, this stipulated language and the prosecution history sounds like they're not talking about we're gonna freeze in time a POS system with every single bit of hardware and software. What they're saying is these prior multifunction card systems required special programming. Ours doesn't. And so you're never gonna need to modify a POS terminal to use these cards. Modify it specifically. So to me, that sounds like individualized or specialized modification, not just the normal technological updates that happen over time that don't relate to this card system. That's correct. That's correct. It'd have to be limited... I mean, our view is that it's gonna be limited to for use in the card system, which in this case are the activation of the gift cards. I'm not sure that that answered the question or that we even understand each other. Because obviously, if the readers, for instance, are updated from the swipe to the chip to the tap, that's updating something used in a card system, but not necessarily for their specific card system. There's a difference between... What I'm trying to get at is there a difference between generic modifications that don't specifically impact the ability of this multifunction card to work differently than specific modifications required to make this work. I know I just got way down the hole on that. But what I'm getting at is obviously these terminals have been updated over the years. And they've been updated in ways that impact everybody that uses a card, not just these multifunction cards. Does their definition in this stipulated construction only preclude modifications that relate to the specific functionality of the multifunction cards, or is it broader modifications all over that relate to just general operation of cards in terminals? I think it's the former. So it's the former. It's only specialized, individualized modifications that take them out. But then what takes them out here? They've made allegations in their expert testimony that these things, is it just that the gist of their argument is still the reason we went here is because these are just like Visa cards and they operate in an unmodified way because I thought that they pointed, that's why they lost an IDT, and they pointed to specific expert testimony that they said was more here. But the expert testimony that they used didn't apply to stipulated construction. The expert testimony was that he was trying to limit the word unmodified to either three claim functions, and then later on we were told that it was limited to four claim functions. And this was all after we filed our motion for summary judgment and after the close of expert discovery. And so the expert in this case never applied the actual construction. And in fact, in his... So let me ask you this then. If either of your accused products do operate like this, that you can just plug them in and they don't require special individualized processing, then why aren't they infringing? Well, they do require... I mean, that was thought... We brought forward all of this undisputed factual evidence that the cards could not be activated or sold without the modifications. And in fact, there were two... What kind of modifications? There were specific... In order to be able to read the card, in order to be able to process it as a purchase transaction as opposed to a payment transaction, specifically with respect to these, the cards that are at issue in this case, there is a special fee that's on top of the card. And the point-of-sale system had to recognize it. May I finish? No, I have a question. If you take your card into... I don't know what your cards do. The briefings weren't very good on the details on this stuff. If you took your card into a retail store that did not have all these modifications you talked about and tried to plug it in, it wouldn't work. Correct. Absolutely wouldn't work. And the evidence is undisputed in that, with that perspective. They took the deposition back in 2012 in a previous one of these Alexan cases and asked the same witness back then and asked that same witness in 2021 the same questions and she answered it the same way, which is without these modifications the cards would not work, the cards could not be read, the cards could not be processed. Does this derivative claim construction thing they're talking about really matter? It sounds like you, even if you agree with that, your view is the summary judgment of no infringement was correct. Absolutely. And in fact, this derivative claim construction thing, this is not in their red brief, I mean in their blue brief. It was only raised in their gray brief and under this court's precedent that's waived. So this whole derivative argument is waived. The whole, the ability to challenge the stipulated claim construction, they can't do that. The court's precedence is clear on that and they don't put forward any argument at all with respect to how under whatever proposed construction, and I heard a different proposed construction today than I've heard in the briefs or even below as to what unmodified means, how under whatever their new construction is that there is infringement. I mean, under the construction that the court that they stipulated to that was adopted by this court and applied in IDT, that was adopted by this court and applied in GAAP, right, that's the construction we're dealing with here. And it's very clear that at the end of the day that modifications made for use in the card system take you outside of the, outside of the claims in this case and in fact we have undisputed modifications and, you know, and what they've done here in this case is exactly what they did in IDT. In IDT you had an expert, or actually two experts who never looked at the point-of-sale terminals. And in this case you have an expert who came out and said, I didn't look at the point-of-sale terminals. In fact, you don't have to actually even look at the point-of-sale terminals to determine whether or not they're unmodified. And what Mr. Richardson has said is now, which is also a brand new argument, that the claims either require a BIN or unmodified and not both. But that's, we claim 34 and claim 60. They require both a bank identification number and that the terminal be unmodified. Both requirements are in those claims. And so, as a result, the view from Alex Ham is that simply this court erred in IDT and therefore we don't have to follow it. And this, they've now told us that, well, that was a mistake. They didn't mean to sort of say that. But as the district court found that basically their approach to IDT is that it doesn't exist. They essentially ignored it. And under both IDT and the GAP case, they are collaterally stopped from challenging the stipulated construction at this point. It's been used in two Federal Circuit cases. One, where ultimately they're putting forward the same infringement theory that they're putting forward now. They put forward DEN. And then, we have to talk about GAP. I mean, in GAP, this court invalidated the two asserted independent claims here, 34 and 60, and four of the dependent claims. And yet, we're still here arguing about them. And their point on GAP, which is, it sort of blew my mind, but with respect to what they ultimately said about GAP in their brief, ultimately, is that they don't say anything about the GAP decision. I mean, I was looking at their gray brief. The table of authorities doesn't mention GAP at all. And that's because there's no citation to, or discussion about the GAP decision in the Alexandria brief. There's no acknowledgement regarding what this court actually said. Can you just describe the substance of the point you make about GAP rather than being interested enough? Sure. Ultimately, GAP used this same construction, the unmodified construction, the stipulated construction, to find that six of the asserted claims in this case were invalidated. They were anticipated by GAP. And is the distinction that your friend on the other side is trying to make today one that was at issue in that decision? It was in the underlying case they had actually proposed a similar claim construction in the GAP and Best Buy cases at Markman in that case that was then rejected by the district court that they did not appeal to the federal circuit. The federal circuit then used that claim construction to invalidate the same claims that we're talking about today based upon specifically the unmodified aspect that Alexan was unable to antedate the anticipatory SVS prior art that was in that particular case. You said something about this argument about the for use in the card system not being in the blue brief. I take it that we've been talking pretty much the whole morning about the section of the brief in the blue brief 42 to 44. The term unmodified refers to the limited list of claim commands and although it's not so easy for me to parse the opening sentence of that section specifically says we're making this argument based on the for use in the card system language. It doesn't feel new. I'm not sure what the argument is exactly but it doesn't feel new. Sorry, this is in Alexan's brief, the blue brief? The blue brief, yeah. Page 42 in the parenthesis? The term unmodified refers to the limited list of claim commands and although it's not so easy for me  the opening  of that section of the brief, it doesn't feel new. I'm not sure what the argument is exactly but it doesn't feel new. Sorry, this is in Alexan's brief, the blue brief? I'm not sure what the    what the opening of that section of the brief is. It's invoking this language. They didn't ask for a derivative construction below. They did not ask for a derivative construction in their blue brief, Your Honor. I respectfully disagree. Ultimately, before the court, before the district court, they tried to make an interpretation argument, which was they said the stipulated construction is absolutely correct, but here we want to interpret the construction differently. We get that all of the construction is a construction and an interpretation is made by the supplier, namely the summary judgment court, that we treat sometimes as a claim construction issue. But in their blue brief, what they asked for was a new construction. They said the district court wrongly construed the unmodified. That is the first heading in the blue brief on page 26. The district court wrongly construed the unmodified term without adequately reviewing the evidence which excluded preferred embodiments. That's one of their kind of process arguments which are highly distracting. All these arguments about your side too, about what was said previously and what was not paid attention to and what was not in the table of authorities. There's a claim construction issue in dispute. They have a position, I'm not entirely sure I understand it, you say no, that's wrong. So you started fairly enough with the prosecution history, a merits point. There's a lot of noise around the only issue that makes any difference which is is the claim construction position that they present is completely wrong. It undermines the prosecution history. Can you tell me what the difference is between what you just told me, the claim construction of unmodified with respect to this versus what the card system is versus what he just seemed to agree to? Because it sounded like you're both saying the same thing. The first time, what he just said was the first time I had ever heard it. So that was his specific recitation. We both agree that with this stipulation, which is how you implement the unmodified portion, the unmodified doesn't mean any modification whatsoever, it just means specific modifications to use the specific cards. Yes. Yes. Absolutely. In fact, we have some undisputed evidence, and it's listed in the factual section of our brief, which goes through and talks about the money spent, the amount of weeks it took to modify the software on those point-of-sale terminals in order to make them work. And so it's, you know, so it's a question of, you know, IDT was a question of they didn't actually put on any evidence as to whether or not it was unmodified. Here, we have all of the evidence to show that, in fact, it was modified. And the only thing you have on the other side  of the red brief are descriptions of the facts in this case     26 of our red brief, all the way to page 27 of our red brief, facts in this case. And the only thing you have on the other  the